**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BENJAMIN RAMEY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Civil Case No.  07-02279** |
| | ) |
| **INTERNATIONAL BROTHERHOOD** | ) |
| **OF ELECTRICAL WORKERS,** | ) |
| **LOCAL 1900,** | ) |
| | ) |
| **Defendant.** | ) |

### NOTICE OF ERRATA IN RELATION TO MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Defendant International Brotherhood of Electrical Workers, Local 1900 hereby gives notice of errata to this Court and all parties regarding the Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss.  Defendant inadvertently failed to attach to its Memorandum Exhibits 1 through 3, which are attached hereto.  Defendant respectfully requests that the Court now attach these exhibits to Defendant's Memorandum.

Respectfully submitted,

 /s/ Jeffrey W. Burritt
Robert E. Paul (D.C. Bar No. 194787)
Jeffrey W. Burritt (D.C. Bar No. 493812)
Zwerdling, Paul, Kahn & Wolly, P.C.
1025 Connecticut Ave., N.W. Suite 712
Washington, DC 20036
Phone: (202) 857-5000
Fax: (202) 223-8417
E-mail: rpaul@zwerdling.com
        jburritt@zwerdling.com

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of December, 2007, a copy of the foregoing Errata was sent, by first-class mail, postage prepaid, to the plaintiff, who is proceeding <u>pro se</u>, Benjamin Ramey, 4251 Clay Street, NE, Washington, D.C. 20019.


<u>/s/ Jeffrey W. Burritt</u>
Jeffrey W. Burritt

EXHIBIT 1

# AGREEMENT

## AND

### ANNEX A
### STANDARD BNER CLASSIFICATION
### AGREEMENT OF MAY 20, 2004
### BETWEEN

**pepco**

POTOMAC ELECTRIC POWER COMPANY,
AND
PEPCO ... COMPANY

AND

LOCAL UNION #1900
OF THE
INTERNATIONAL BROTHERHOOD
OF
ELECTRICAL WORKERS

EFFECTIVE May 20, 2004
2004 - 2008

With Wage and Salary Schedule
Effective
May 20, 2004
May 20, 2005
June 5, 2006
May 1, 2007
June 1, 2008

## PREAMBLE

THIS COLLECTIVE BARGAINING AGREEMENT IS MADE BY AND BETWEEN POTOMAC ELECTRIC POWER COMPANY AND PHI SERVICE COMPANY (HEREINAFTER REFERRED TO AS THE "COMPANY") AND LOCAL UNION #1900 OF THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS (HEREINAFTER REFERRED TO AS THE "UNION"). THE PARTIES DO HEREBY AGREE AS FOLLOWS:

## ARTICLE 1

## MANAGEMENT

**Section 1.01.** By reason of the nature of the business of the Company it is essential, and is therefore agreed, that the management of the Company, the supervision and control of all operations and the direction of the working forces, including, but not limited to, the right to hire, suspend, furlough, discipline, discharge for cause, promote, demote, or transfer employees, and the right to operate the Company, shall be vested in, and reserved to, the Company, except as herein limited.

## ARTICLE 2

## BARGAINING UNIT

**Section 2.01.** The Union is recognized as the sole collective bargaining agent for the bargaining unit, which is composed of all employees of the Company in all Pepco and heritage Pepco bargaining unit classifications at all work locations, regardless of the method of pay, excluding only confidential employees, security employees (guards), and professional, supervisory and management employees. Pepco heritage bargaining unit classifications are those bargaining unit classifications in PHI Service Company that were formerly in Pepco on the date immediately preceding the merger of Pepco and Conectiv (July 31, 2002).

**Section 2.02.** Regular employees are employees whose employment is reasonably expected to be permanent at the time they are employed, and it is contemplated that they will work in each calendar week a normal workweek.

**Section 2.03.** Temporary employees are employees whose employment is with the definite understanding that the employment is not of a permanent nature, but it is contemplated that they will work a normal workweek while employed. The Company will inform the Union of the employment and assigned Department of such employees and the expected duration of their employment.

**Section 2.04.** Whenever the terms "employee" or "employees" are used in this Agreement, they shall refer only to employees in the bargaining unit as identified herein unless specifically stated otherwise.

**Section 15.04.**  Employees in limited service status who become subject to a reduction under the terms of Article 9 shall first have their status reviewed under the terms of this Article including classification and seniority.

**Section 15.05.**  When an employee is to be changed to, or from, limited service, the case will be discussed with the Union and his/her seniority status decided by mutual agreement.

**Section 15.06.**  Future status of an employee's ability to return to his/her former job or a job of higher classification shall be subject to review at anytime the employee's condition improves to allow such consideration.  If the employee is found to be capable of performing the duties of his/her former job as determined by the Company's medical consultant (internal or external), he/she shall be returned to the job in question assuming there is a vacancy.  Concerning a job in a higher classification or a job in another Occupational Group, if the employee is found to be capable of performing the duties of such job as determined by the medical consultant (internal or external), the employee shall be given consideration on the next job vacancy.

**Section 15.07.**  All employees are expected to actively bid on other jobs after being placed on Article 15.  To facilitate placement into an appropriate job, the Company may conduct a functional or vocational assessment of any employee placed on Article 15.  While an employee is on Article 15, the Company shall endeavor to place him/her as set forth is Section 15.01 above.

## ARTICLE 16

### SUSPENSION AND DISCHARGE

**Section 16.01.**  The maintenance of discipline is the responsibility of the Company and to that end the Company may discipline employees for cause.  A copy of all disciplinary actions issued to Bargaining Unit employees will be forwarded to the Union.  This includes all Oral Reminders, Written Reminders, Decision Making Leaves (DML), and notices of meetings regarding continuation of employment (and resulting determinations from such meetings).

**Section 16.02.**  In the event the Company believes that a Bargaining Unit employee's problems regarding work performance, conduct & safety, or attendance appears to warrant discharge, a meeting will be scheduled for that employee before his/her Director (or designated representative); other Company representatives may also be present.

**(a)**     The employee and the Union will be notified, in writing, at least two (2) days prior to the meeting.  The notification will include the date and time of the meeting, a statement describing the employee's performance problem(s), and a statement to the employee advising of his/her right to Union representation (also included will be the Union's telephone number).

**(b)**     The Company will endeavor to assure that a Union Steward is available when an employee is notified of the meeting.  In the event a Steward is not available, the Union office will be notified as soon as reasonably possible.

**(c)**     The purpose of the meeting is to assure that an appropriate decision is made regarding the Bargaining Unit employee's continued employment with the Company.  A representative

of the Union may attend that meeting. If desired, the employee may allow that Union official to represent him/her at that meeting. During this meeting, all parties will make all relevant facts available. Further, the Company may allow witnesses with relevant information to testify at the meeting.

**(d)** After the meeting, and after the Company has completed any additional investigation that it deems appropriate, the employee will be advised, in writing, of the Company's final determination. A copy of that determination will be forwarded to the Union. It is understood that employees will remain at work pending the Company's final determination, unless that employee has been placed on Crisis Suspension or Excused With Pay.

**Section 16.03.** In the event a Bargaining Unit employee is placed on Crisis Suspension or Decision-Making Leave, the Company will endeavor to assure that a Steward is present when the employee is notified. In the event a Steward is not available, or it is impractical to have a Steward present, the management representative who places the employee on Crisis Suspension or Decision-Making Leave is responsible for ensuring that the Union office is notified as soon as possible. Additionally, the employee will be provided with the Union's telephone number.

**(a)** It is understood and agreed that a Crisis Suspension does not necessitate a meeting before the employee's Director (or designated Representative) unless that suspension is expected to be converted to discharge. However, in the event a Crisis Suspension extends past five (5) days, the Union shall have the right to request a hearing. In the event of such request, the parties shall, within two (2) days, arrange to meet and discuss the employee's employment status.

**Section 16.04.** In the event the Union disagrees with a Company decision to discharge a Bargaining Unit employee, the Union may, within five (5) working days after the determination, appeal the discharge directly to Arbitration in accordance with Article 18. However, prior to Arbitration, the Union may request that a Step 2 meeting be held to discuss the matter.

**Section 16.05.** Crisis suspensions may be appealed directly to Step 2 of the Grievance Procedure, Article 17.

## ARTICLE 17

### GRIEVANCE PROCEDURE

**Section 17.01.** It is considered by the parties that all grievances should be presented promptly, discussed without delay and answered within a reasonable time. A grievance is defined as a violation of a specific term(s) or provision(s) of this Agreement or of an established precedent in terms and/or conditions of employment. It is also considered that grievances should be settled whenever possible at the levels where the greatest familiarity with the subject matter exists. Any individual employee or group of employees shall have the right to present grievances and to have them considered for adjustment, provided any adjustments are not inconsistent with the terms of this Agreement and a Union representative has been given an opportunity to attend as provided in this procedure. Therefore, it is agreed that all grievances shall be subject to the following grievance procedure.

**Section 17.02.** Any employee who believes that he/she has a grievance shall, within one (1) week after the cause of the grievance is alleged or known to have taken place, discuss it with his/her immediate supervisor. The employee may, if he/she desires, have his/her Steward present during the discussion. The supervisor shall within three (3) workdays after the discussion, notify the employee or Steward (if present at the discussion) of his/her disposition of the matter.

**Section 17.03.** Step 1--If the appropriate supervisor's response does not resolve the grievance, then within two (2) weeks after the cause for the grievance is alleged or known to have taken place, the grievance shall be stated in writing on forms available from the Company or the Union, listing facts, reasons, Agreement provisions in question, and/or established precedent in terms and conditions of employment. The grievance must be numbered (by the Local Union Office), dated and signed and one (1) copy shall be delivered to the Department Head and one (1) copy shall be delivered to the Department handling Labor Relations. If a grievance is not delivered to the Department Head within two (2) weeks after occurrence of cause for the grievance, it will no longer exist.

**Section 17.04.** Within one (1) week of delivery of the aforesaid grievance to the Department Head, the appropriate supervisor(s), the grievant, Steward, and/or Chief Steward shall meet to resolve the grievance. Within one (1) week after the meeting, the appropriate supervisor(s) shall give written notice to the Steward, with a copy to the Local Union President, of the determination of the grievance. If the grievance is not resolved, it may be taken to Step 2.

**Section 17.05.** Step 2--If the grievance is not resolved in Step 1, the President of the Local Union (or his/her designated representative) may, within two (2) weeks after receipt of the written determination in Step 1, submit in writing to the Manager responsible for handling Labor Relations (or his/her designated representative) a request for a meeting to resolve the grievance. Within one (1) week after receipt of such request from the Local Union President (or his/her designated representative), the Manager responsible for handling Labor Relations (or his/her designated representative) shall arrange to meet with the Union's Grievance Committee (grievant, Steward, Chief Steward, and/or Local Union President or his/her designated representative) to resolve the grievance. Such meeting will be held within four (4) weeks of the receipt of the request unless mutually agreed otherwise. The Union and the Company may have present and eligible to participate in the discussion any persons they so desire. Within two (2) weeks after the meeting, the Manager responsible for handling Labor Relations (or his/her designated representative) shall give written notice to the Local Union President (or his/her designated representative) of the determination of the grievance. If the grievance is not resolved in Step 2, it may be taken to arbitration as provided in Article 18.

**Section 17.06.** Discussions regarding grievances shall be conducted as far as practicable during the employee's working hours.  Payment for discussions regarding grievances shall be compensated as outlined in Article 4 of this Agreement.  All employees shall first obtain permission from their supervisor to be absent for such meetings and must report to him/her upon returning.

**Section 17.07.** Grievances relating to matters which extend beyond a single Department, Division, or Group may originate in the Step of the grievance procedure where management authority to settle the matter exists, but no grievance may be taken to arbitration until it has been presented in Step 2, except where time limits as described in Section 17.05 have been exceeded and then only if the party seeking to move the matter to arbitration has not caused or contributed

44

to the time limits being exceeded or except as otherwise provided for in Section 16.04 regarding discharges.

**Section 17.08.** Whenever a grievance involves a group of employees, a committee of not more than three persons, which shall include the appropriate Steward and at least one of the employees affected, may be substituted for an employee wherever the word "employee" is used in the grievance procedure.

**Section 17.09.** It is agreed that the grievance procedure or time limits may be varied at anytime by agreement of the parties when such action appears to be necessary or desirable.

**Section 17.10.** The Union and the Company shall inform each other of persons authorized to represent them in grievance matters.

**Section 17.11.** Grievances of the Company or Union shall originate in the lowest step where authority to take appropriate action exists.

**Section 17.12.** The grievance procedure is applicable to all employees in the bargaining unit except as otherwise restricted elsewhere in this Agreement, provided, however, that terminations of regular employees during their first year of continuous service and terminations of temporary employees at anytime may not be the subject of a grievance.

**Section 17.13.** Failure to comply with the time limit provisions by employees or Union representatives shall invalidate the grievance. Failure to comply with the time limit provisions by Management representatives shall permit the grievance to be advanced to the next Step of the grievance procedure.

## ARTICLE 18

## ARBITRATION

**Section 18.01.** Any grievance not resolved in Step 2 of the grievance procedure may be submitted to impartial arbitration.

**Section 18.02.** The Company or the Union shall notify the other party of its desire to proceed to arbitration within two (2) weeks of receipt of the Step 2 answer. Such notice shall be in writing and shall specify the grievance to be arbitrated and state the issue(s) involved.

**Section 18.03.** An impartial Arbitrator shall be selected by mutual consent of the Company and the Union as soon as practicable after receipt of the request for arbitration. If the parties do not agree on the selection of an Arbitrator within two (2) weeks after receipt of the request for arbitration, the American Arbitration Association shall select from a standing panel (agreed to by the parties in the Memorandum of Understanding by which this Agreement was established) the five Arbitrators least recently selected under this Article and shall provide a list thereof to each party. Within one (1) week following receipt of the list of Arbitrators, the parties shall meet and alternate in striking names from the list with the loser of a coin toss striking first. The remaining name, after each party has struck twice, shall be the impartial Arbitrator.

45

**Section 18.04.** The arbitration hearing shall be held as quickly as possible. The award of the Arbitrator shall be final and binding upon both parties and upon the employee(s) involved. The fees and expenses of the Arbitrator, and any other expenses agreed to by the parties prior to the arbitration hearing, shall be shared equally by the Company and the Union. The Arbitrator shall have power and authority to arbitrate only those matters expressly made subject to arbitration by the terms of this Agreement and shall rule only on the issues submitted to him/her. The Arbitrator shall have power only to interpret this Agreement and shall not have the power to alter or amend it.

**Section 18.05.** At the request of either party, a grievance involving the discharge or discipline of an employee shall be submitted to Expedited Arbitration (as defined below). The Arbitrator for such Expedited Arbitrations shall be appointed from a standing panel of at least ten (10) Arbitrators agreed to by the parties in the Memorandum of Understanding by which this Agreement was established. As soon as practicable after receipt of the arbitration request referred to in Section 18.02 above, the parties shall try to agree on a date(s) to arbitrate the case. If agreement is reached, the parties shall notify the American Arbitration Association (hereinafter "AAA") of the desired date(s). The AAA will then appoint an Arbitrator from the parties' standing panel who is available on the requested date(s). Prior to the parties' selection of a mutually acceptable date(s), neither party shall be informed of the availability of a named Arbitrator on a particular date. If the parties are unable to agree on a date within two (2) weeks after receipt of the request for arbitration, either party may so notify the AAA, requesting that the AAA appoint an Arbitrator who will set the time and date(s) after considering the parties' positions on when the case should be heard. In appointing Arbitrators under this Section, the AAA shall make every effort to evenly distribute the cases among the standing panel of Arbitrators. The Expedited Arbitration will be conducted according to the Expedited Arbitration rules generally in effect, except to the extent inconsistent with this Section.

## ARTICLE 19

### APPLICABLE LAWS AND REGULATIONS

**Section 19.01.** It is understood and agreed that the provisions of this Agreement are in all respects subject to all applicable laws and governmental regulations now or hereafter in effect and to the lawful rulings and orders of all regulatory commissions now or hereafter having jurisdiction. Should any provision of this Agreement be found to be in conflict with any applicable laws or lawful rulings or regulations, the parties shall at once meet for the purpose of discussing and/or modifying that portion of the Agreement only.

**Section 19.02.** The Company will endeavor to comply with all state and local laws and regulations relating to the safety and health of employees and will take such additional steps as may be necessary to make adequate provision therefore, including the establishment and maintenance of appropriate first aid stations and other facilities. The Company will also formulate and publish safety rules to which the employees shall be required to conform.

EXHIBIT 2

POTOMAC ELECTRIC POWER
COMPANY

and

INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS,
LOCAL 1900

AAA No. 16 300 00643 04

President's Grievance -
Benjamin F. Ramey

**_Appearances_**

For the Company    -    Jill D. Flack, Esq.
                       David A. Duarte

For the Union      -    Joseph E. Hawkins
                       John A. Coleman
                       Benjamin F. Ramey, Grievant

Arbitrator         -    Charles Feigenbaum

The parties to this dispute are the Potomac Electric Power Company [Company], and the International Brotherhood of Electrical Workers, Local 1900 [Union]. The Arbitrator was selected under the procedures contained in the parties' collective bargaining agreement. The hearing was held in Washington, D.C., on December 10, 2004.

Both parties were represented and had full opportunity to examine and cross-examine witnesses, to offer evidence, and to set forth their positions. All witnesses were sworn. Both parties made oral closing argument at the hearing. Based on the evidence, the positions argued by the parties, and the observation of witnesses while testifying, I make the following findings and Award.

<u>ISSUE</u>

The parties stipulated the issue as:

Did the Company have just cause to issue the Grievant Decision Mak-

PEPCO/IBEW 1900
AAA 16 300 00648 04 (Benjamin Ramey)
Page 2 of 10

ing Leave? If not, what shall be the remedy?

## RELEVANT GOVERNMENT REGULATIONS AND COMPANY RULES

### I.  U.S. DEPARTMENT OF TRANSPORTATION FEDERAL MOTOR CARRIER SAFETY REGULATIONS

**§40.225  What form is used for an alcohol test?**

(a) The DOT Alcohol Testing Form (ATF) must be used for every DOT alcohol test beginning February 1, 2002. . . .

**§40.227  May employers use the ATF for non-DOT tests, or non-DOT forms for DOT tests?**

(a) No, as an employer, BAT, or STT,[1] you are prohibited from using the ATF for non-DOT alcohol tests. You are also prohibited from using non-DOT forms for DOT alcohol tests. Doing either subjects you to enforcement action under DOT agency regulations.

**§382.307  Reasonable suspicion testing**

(a) An employer shall require a driver to submit to an alcohol test when the employer has reasonable suspicion to believe that the driver has violated the prohibitions of subpart B of this part concerning alcohol. The employer's determination that reasonable suspicion exists to require the driver to undergo an alcohol test must be based on specific, contemporaneous, articulable observations concerning the appearance, behavior, speech or body odors of the driver.

(c) The required observations for alcohol and/or controlled substances reasonable suspicion testing shall be made by a supervisor or company official who is trained in accordance with §382.603. The person who makes the determination that reasonable suspicion exists to conduct an alcohol test shall not conduct the alcohol test of the driver.

(d) Alcohol testing is authorized by this section only if the observations required by paragraph (a) of this section are made during, just preceding, or just after the period of the work day that the driver is required to be in compliance with this part. A driver may be directed by the employer to only undergo reasonable suspicion testing while the driver is performing safety-sensitive functions, just before the driver is to perform safety-sensitive functions, or just after the driver has

---

[1] BAT (Breath Alcohol Technician), STT (Screening Test Technician).

PEPCO/IBEW 1900
AAA 16 800 00643  04 (Benjamin Ramey)
Page 3 of 10

ceased performing such functions.

(e)(1) . . . If an alcohol test required by this section is not administered within eight hours following the determination under paragraph (a) of this section, the employer shall cease attempts to administer an alcohol test and shall state in the record the reasons for not administering the test.

## II.  HUMAN RESOURCES -- CORPORATE PERSONNEL POLICIES -- NO. 80.200 DRUG AND ALCOHOL

### Alcohol Standards

### Fitness For Duty/Alcohol in System

Employees must report to work and while on duty or on Company property must remain in a condition to perform their duties safely and with maximum efficiency.

> An employee in any job classification may not have a blood-alcohol concentration of 0.05% or more (or have a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property. An employee found to have a to have a blood-alcohol concentration of less than 0.05% (or its equivalent) shall be considered in violation of this standard where it can be determined based on accepted medical ranges that the employee had a concentration of 0.05% or more (or its equivalent) while on duty or on Company property. In either of these circumstances, the employee shall be placed on Decision-Making Leave (DML).

### Other Rules

### Testing

Employees will be required to submit to blood, urine, breathalyzer or other diagnostic tests to detect alcohol and/or drugs (or drug metabolites) in their system under any of the following circumstances:

- When there is a triggering event or a reason to believe drugs or alcohol may have been used;

- When such testing is required under local or federal legislation, regulation or administrative rule;

PEPCO/IBEW 1900
AAA 16 300 00643 04 (Benjamin Ramey)
Page 4 of 10

## BACKGROUND

The Grievant, Benjamin F. Ramey, is employed by the Company as a Conduit Installer A. His work requires him to drive commercial vehicles and he has a Commercial Driver's License (CDL). He is covered by the U.S. Department of Transportation (DOT) Federal Motor Carrier Safety Regulations.

He worked the midnight to noon shift on August 30, 2003. His supervisor was Gregory M. Johnson. Shortly after the Grievant reported for work at the Benning Service Center, he asked Mr. Johnson if he could go off-site and buy cigarettes; Mr. Johnson permitted him to do so. Mr. Johnson testified that he saw nothing unusual about the Grievant at this time.

At or about 2 a.m., Mr. Johnson needed the Grievant to operate a 26,000 pound dump truck. Mr. Johnson asked some of the Grievant's fellow employ-ees to find him and have him report to Mr. Johnson so he could give him the assignment. They could not locate him at first and Mr. Johnson told them to look for him in the parking lot. After a little while, first one employee, and then a second, told Mr. Johnson that the Grievant was in no condition to drive. One of them described him as being "out of it."

The Grievant came into Mr. Johnson's office some 15 minutes later. Mr. Johnson said he smelled of alcohol, his speech was slurred and incoherent, he was unsteady on his feet and his eyes were very bloodshot.

Mr. Johnson concluded that the Grievant was under the influence of alcohol. He called his general manager for instructions and also spoke to other Com-pany officials. Eventually, he spoke with Senior Business Partner David A. Duarte, who told him to bring the Grievant with him and report to Company headquarters at Edison Place. When they arrived, Mr. Duarte and Union steward Loman Dudley were there. They were joined by Human Resources Business Partner Negussie B. Birratu at about 5 to 5:30 a.m. Both Mr. Duarte and Mr. Birratu have Labor Relations responsibilities.

Mr. Duarte stated that it was about 3:30 to 4 a.m. when the Grievant and Mr. Johnson arrived at Edison Place. He spoke with the Grievant at this time and said there was a very strong odor of alcohol about him. He had trouble maintaining his balance, his speech was slurred and his eyes "were very, very bloodshot." He asked the Grievant if he had been drinking and said that the Grievant told him that he had had "a couple of beers" before coming to work. Mr. Johnson corroborated that the Grievant made this statement. Mr. Duarte decided that there were grounds for reasonable suspicion that the Grievant had been drinking and that testing was appropriate.

Mr. Birratu testified that he considered the Grievant to be under the influence of alcohol based on his observation of his unsteady gait, slurred speech and very bloodshot eyes. He, Mr. Duarte and Mr. Johnson, all testified that they had been trained in alcohol and controlled substance use as specified in DOT regulation §382.603.

Mr. Duarte attempted to contact the Company's on-duty tester so that the Grievant could be tested. There was no response. He tried some three or four times without success. He called a Benefits Department supervisor and said there was need to make some alternative arrangement for testing. She told him she would make calls and get back to him, which she did about an hour later. She gave him a location in Northern Virginia where she said the testing could be conducted. Mr. Duarte then arranged for Mr. Birratu, Mr. Johnson, Mr. Dudley and the Grievant to drive from Edison Place to that location. By this time it was about 6 a.m.

The trip was one misadventure after another. First, the men got lost. Then, when they arrived, it was at the wrong location. They had gone to Inova Hospital; it did not administer tests. They were told they should have gone to its clinic, a satellite facility. There were administrative problems at the clinic and no testing was done there. All of this took some hours, during which time they kept in telephone contact with Mr. Duarte. It was decided that they

would all meet at Edison Place and the men drove back there.

When it was evident that the trip to Northern Virginia had been unsuccess-
ful, the benefits supervisor attempted to arrange for someone to come to Edi-
son Place to test the Grievant there. She was able to get Thomas Hyde, a self-
employed certified Drug Screen Collector and Breath Alcohol Technician. He
arrived at Edison Place at about 10 a.m. It took some time before he was
ready to administer the tests. There was a problem with getting the correct
forms and he did not begin testing until after 11 a.m.

The Company's original intention had been to have the Grievant tested under
the DOT rules. However, it was now more than eight hours since Mr. John-
son and Mr. Duarte had reached their "reasonable suspicion" conclusions. Mr.
Hyde stated, as the others were already aware, that it was now too late for
application of DOT testing. Based on Corporate Personnel Policy No. 80.200,
Mr. Duarte told Mr. Hyde to give the Grievant non-DOT tests.[2]

Mr. Hyde tested the Grievant twice. The first Breathalyzer result was
0.070%. This was at 11:09 a.m. He did a confirmatory test at 11:32 a.m., with
a score of 0.065%. The Grievant was issued Decision-Making Leave (DML)
based on the 0.065% Breathalyzer result. DML is the disciplinary step one
level below termination. It is required by Policy No. 80.200 when an employee
has a concentration of 0.050% or more while on duty or Company property.

At the hearing, the Grievant vigorously denied that he had been drinking be-
fore coming to work or that he had said anything about having a couple of
beers. He also stated he had not had anything to drink while on his shift. Mr.
Dudley testified that he did not see signs of alcohol impairment and said that
a doctor at the clinic had told him that the Grievant didn't look drunk to him.

Both the Grievant and Mr. Dudley said that the Grievant had not been al-

---

[2] Mr. Hyde tested the Grievant for both drugs (urine test) and alcohol (Breathalyzer). How-
ever, because the discipline given him was based solely on the results of the Breathalyzer
test there is no need for further mention of the drug test.

lowed to go to the bathroom while at Edison Place before going to Virginia.
Mr. Dudley said he was allowed to go at the second location only after Mr.
Dudley protested when Mr. Birratu refused the Grievant's request. The
Grievant said he was never *allowed* to go. He took it upon himself to do so in
Virginia when he felt he could no longer hold himself in. He also said Mr.
Duarte had shouted "Shut up" at him when he made a second request at Edi-
son Place.

Mr. Duarte denied having told the Grievant to shut up, but agreed that he
had not allowed him to visit the bathroom at Edison Place when he first re-
quested to do so. That was when he was still hoping that they could reach the
on-duty tester and have DOT tests performed. He reasoned that allowing the
Grievant to relieve himself at the time might result in a lengthy wait for him
to provide another urine sample when the tester arrived. He said, however,
that once it was apparent that the tester was not coming, the Grievant was
permitted to go to the bathroom. Mr. Birratu stated that the Grievant had
gone to the bathroom twice; once at Edison Place and then at the second Vir-
ginia location.

Mr. Dudley testified that Mr. Hyde told the group that he did not have the
correct forms and it would be illegal to administer the test under the circum-
stances. Then, after Mr. Hyde and Mr. Duarte met separately, Mr. Hyde pro-
ceeded to conduct the test. When Mr. Dudley questioned him about this, Mr.
Hyde reiterated that this was illegal, but said he was going to do it anyway.
The Grievant testified that after Mr. Hyde stated there was a problem, Mr.
Duarte motioned for him to follow him and they went into a separate room
and closed the door. They came out after about five minutes and he was told
to take the Breathalyzer test.

Both Mr. Duarte and Mr. Hyde denied any separate meeting. Mr. Hyde also
denied having said that testing would be illegal. He testified that the testing
had been legally performed. He stated that the DOT regulations recognize

PEPCO/IBEW 1900
AAA 16 300 00643 04 (Benjamin Ramey)
Page 8 of 10

that non-DOT testing can be done so long as non-DOT forms are used.

## DISCUSSION AND FINDINGS

There are two key questions here. The first is, was the testing of the Grievant improper, making the results of the Breathalyzer null and void? In the event that the testing was not improper, the second question is, was he in violation of Corporate Personnel Policy No. 80.200? The answers to these questions are "No" and "Yes." That is, there was nothing improper in the administration of the Breathalyzer test, and the Grievant was in violation of Corporate Personnel Policy No. 80.200. For that reason, there was just cause for the DML.

The Company stipulated at the hearing that more than eight hours had elapsed between the time when Mr. Duarte and Mr. Johnson reached their "reasonable suspicion" conclusions and when the Grievant was given the Breathalyzer test. Because of this, a DOT alcohol test could not be administered, see §382.307(e)(1).

The Union concludes from this that this provision made it impermissible to test the Grievant for alcohol concentration. Period. It argues that once the eight hours had passed, he should not have been tested and the test result is null and void. The record does not support this reasoning.

The DOT regulations specify the circumstances under which DOT alcohol testing is to be done. Nothing that has been brought to my attention indicates that if the requirements for DOT testing are not met, other, non-DOT alcohol testing, is also prohibited.

It is true that the last sentence of §382.307(e)(1) states:

> If an alcohol test required by this section is not administered within eight hours following the determination under paragraph (a) of this section, the employer shall cease attempts to administer an alcohol test and shall state in the record the reasons for not administering the test.

However, the context makes it plain that the mandate to employers to cease

PEPCO/IBEW 1900
AAA 16 300 00643 04 (Benjamin Ramey)
Page 9 of 10

attempts to administer an alcohol test after eight hours applies *to a DOT alcohol test*. The regulations, §40.227(a), recognize that an employer may administer a non-DOT test. The only prohibition in this regard is that the DOT alcohol testing form (ATF) may not be used for a non-DOT alcohol test. Conversely, a non-DOT form may not be used for a DOT alcohol test.

The Grievant was given a non-DOT alcohol test and Mr. Hyde used a non-DOT form. I find, therefore, that there was nothing illegal about conducting the Breathalyzer test as Mr. Hyde did and I credit his testimony that he never said that it was.

Corporate Personnel Policy No. 80.200 furnishes authority, separate from the DOT regulations, for conducting "reasonable suspicion" alcohol tests. It does not contain time limits.

There was a valid basis for the Company to require the Grievant to undergo "reasonable suspicion" alcohol testing under this policy. Mr. Duarte, Mr. Johnson and Mr. Birratu all testified credibly that they observed that the Grievant's speech was slurred, his eyes were very bloodshot and he was unsteady on his feet. These were observations any layman could make. In addition, all three had received training under §382.603.

Mr. Hyde testified credibly about the manner in which he administered the test and the calibrations he made. I find that the test was accurate and that, at 11:32 a.m. on August 30, 2003, the Grievant had an alcohol concentration of 0.065%. That being the case, the discipline of DML was required under Policy No. 80.200.

Finally, there is disputed testimony about whether Mr. Duarte shouted "Shut up" at the Grievant and the degree to which the Company barred him from going to the bathroom to relieve himself. I make no finding about these matters because, even if the testimonies of the Grievant and Mr. Dudley on these points are fully credited, the Company's alleged actions would not warrant

AAA 16 300 00643 04 (Benjamin Ramey)
Page 10 of 10

overturning the DML in these circumstances. The overwhelming evidence in this case is that the Grievant was under the influence of alcohol while on duty and on Company property.

## AWARD

This grievance is denied.


_____
Charles Feigenbaum

December 14, 2004
_____
Date

EXHIBIT 3



In the Matter of the Arbitration        )
                                        )
         Between                        )
                                        )
POTOMAC ELECTRIC POWER                  )
COMPANY                                 )
                                        )       AAA No. 16 300 E 00137 05
         and                            )       Grievant:  Benjamin F. Ramey
                                        )       Issue:  Termination
LOCAL UNION NO. 1900,                   )
INTERNATIONAL BROTHERHOOD               )
OF ELECTRICAL WORKERS                   )


Before:                                 Jerome H. Ross, Arbitrator

Date of Hearing:                        July 11, 2005

Appearances

    For the Company:                    Jill D. Flack, Esq.

    For the Union:                      Joseph E. Hawkins


### Statement of the Case

   In this grievance, dated November 4, 2004, the Union protests the termination of

Benjamin F. Ramey, a Conduit Installer A, with a seniority date of October 7, 1991.  As a

remedy, the Union requests that the grievant be reinstated and made whole for all lost

wages and benefits.

   In the early morning hours of August 30, 2003, the grievant's supervisor on the

midnight shift informed Dave Duarte, a Sr. Business Partner in human resources, that the

grievant appeared under the influence of alcohol or drugs.  Duarte determined to have the

grievant tested for drugs and alcohol under the U.S. Department of Transportation (DOT)

regulations. The grievant's job duties involve the operation of commercial motor vehicles in excess of 26,000 pounds, and he is required to hold a commercial drivers licence (CDL). Due to the holiday weekend and a storm, difficulties were encountered in arranging for the tests. When the tests were finally administered, the grievant tested positive with a blood-alcohol concentration (BAC) of 0.065. The Company's Drug and Alcohol Policy states:

> *An employee in any job classification may not have a blood-alcohol concentration of 0.05% or more...while on duty or on Company property. In...these circumstances the employee shall be placed on Decision-Making Leave (DML).

On September 10, 2003, after retesting negative and determined to be drug-free, the grievant was returned to work with no driving duties. An appointment was made for him to discuss entry into a rehabilitation program with the Corporate Nurse, Stacy Saucier.

On September 15, 2003, the grievant met with Russ Wade, a licensed psychiatric social worker, who serves as a substance abuse professional for the Company and other companies in the Washington, D.C. metropolitan area. Wade is referred through a managed care company, Value Options, which provides employee assistance program services to employers. Wade's role is to meet with an individual to assess and match up the person with an appropriate treatment or educational facility. After two-to-four weeks in a treatment or educational program, Wade again sees the person to ensure that he or she is "doing what they are supposed to do." He sees the person a third time after the program has ended to ensure satisfactory completion of its requirements. During the course of the program, Value Options is in touch with the program provider and alerts Wade if a person does not complete the program.

3

By letter dated September 15, 2003, Wade informed Saucier that he had evaluated the grievant in accordance with the DOT Substance Abuse Guidelines after the grievant's violation of DOT rules with a positive substance abuse screen on August 30, 2003. Wade recommended enrollment at the Kolmac Clinic in an intensive outpatient alcoholism treatment program.[1]

In a memorandum dated September 30, 2003, and titled Decision-Making Leave, Bill Sigafoose, then the Division Manager for Underground Maintenance and Construction, confirmed for the grievant the events that led up to placement on the DML on September 10, 2003.[2] The memorandum further states:

> ...While you are on DML, the final level of Positive Discipline, it is necessary for you to maintain your total job performance at a fully acceptable level in every area, since any further problem in the next eighteen (18) months in any performance category (work performance, conduct and safety, or attendance) that require disciplinary action, will result in your discharge.

>       *             *         *

> You are also being placed on drug and alcohol probation for a period of three (3) years and shall be subjected to random drug and alcohol testing during the first two (2) years of the probation period. This testing is in addition to the CMV Drug Testing of Policy 10.00. If you fail to meet any of the provisions set forth during the probationary period, you will be discharged.
> You must meet and consult with the Corporate Nurse as to an appropriate rehabilitation program. You must make a good faith and successful effort to complete any recommended rehabilitation program, including counseling. If you fail to attend, participate in or complete rehabilitation activities which are required by the health care professionals to whom you are referred, you shall be discharged.

---

[1] DOT regulations and Company policy require enrollment in a rehabilitation program before an employee who has violated DOT rules is allowed to drive a commercial motor vehicle.
[2] An arbitration award, dated December 14, 2003, denied the Union's grievance protesting the issuance of the DML in connection with the incident on August 30, 2003.

Although the grievant continued to report to work and perform duties that did not involve the operation of commercial motor vehicles, he did not contact Kolmac. After Duarte and Saucier learned that the grievant had not enrolled in the program, Saucier sent the grievant a memorandum, dated October 8, 2003, stating:

> In response to recent information regarding your recommended treatment program, Pepco has been informed that you have refused to schedule and [sic] appointment at the KOLMAC.
> At this time, you are required to schedule and [sic] appointment with the KOLMAC program that has been recommended to you by Mr. Russ Wade. Once you have scheduled an appointment, you are to call me to give me the date and time of the appointment.
> Once you have attended the first appointment you are also required to call to notify me that you have attended the appointment and provide the dates of subsequent schedule of sessions in the KOLMAC program....
> Upon receipt of this requested information, I will notify the Compliance department and they will be in contact with you regarding return to work.

On October 13, 2003, the grievant tested negative on a urine drug screen, as reported on October 16, 2003, in connection with entry into the Kolmac program. Kolmac's intake sheet for the grievant, which appears to have been completed by a Kolmac interviewer, states under "Reason for seeking treatment at this time": "Pt took breathalyzer 12 hours after admitting to employer that he had been drinking....Referred here by employer (PEPCO)." The sheet further states under "Problems and stresses including work": "<u>Work</u> Went to work drunk – EAP Stacey Saucier – Cannot return to work until completes Program. Denies all other stressors. Denies he is alcoholic." The grievant's Kolmac medical file notes indicate that he began taking antabuse in conjuction with his treatment.

While continuing to work and perform non-DOT related duties, the grievant attended all scheduled evening sessions at Kolmac during the two-week of period October 13-27, 2003 (excluding Saturday and Sunday), after which he was discharged

5

from the program. The Session Notes, which are completed by the Kolmac counselor at each session, indicate that the grievant reported having been abstinent on all dates except before the October 20 and 27 sessions. The counselors' narrative notes for each session, which are not totally legible, state:

October 13 – introduced [illegible] himself to the group
October 14 – not clear of necessity of [illegible]
October 15 – doesn't see himself as a recovering alcoholic[.] Hopes to take advantage of the treatment.
October 16 – hasn't admitted his alcoholism yet, probably [because] hasn't had typical withdrawal symptoms – any [illegible] these sessions interfere with his routines
October 20 – relapsed over weekend; doesn't see himself as "alcoholic"
October 21 – different outlook than before – more energized with abstinence & likes the feeling – has some alcohol in the house but doesn't bother him [-] usually drank on weekends – so far so good
October 22 – admits he is a "recovering alcoholic" – last weekend didn't drink & it was OK
October 23 – doing alright. Evenings are full around home
October 27 – drank on feelings of reacting to others.

On October 28, 2003, at about 1:00 a.m., the grievant went to the emergency room at Howard University Hospital, where he was diagnosed with high blood pressure and referred to his personal physician who, it appears, in turn referred him to a psychiatrist. The grievant called in to report off work and was on sick pay until the end of April 2004, after which he filed for workers compensation.

By letter dated November 10, 2003, Wade informed Saucier that the grievant was discharged from the Kolmac treatment program as of October 27, 2003. The letter further states that "Rhonda of Value Options in Texas" told Wade that she had received the copy of the termination letter, and the grievant was terminated for having a positive breathalizer reading while in attendance.

On March 4, 2004, the grievant was examined by Dr. Schulman, an occupational

psychiatrist, after referral by Colonial Health, the Company's health care administrator,

for an independent medical evaluation. Dr. Schulman's 11-page report, dated March 12,

2004, concludes with the following recommendations:

> A. Mr. Ramey is close to, but not quite yet at, [sic] maximum
> medical improvement (MMI). I recommend that he remain compliant
> with the treating psychiatrist's medical recommendations.
> B. In all medical likelihood, Mr. Ramey should recover without a
> residual impairment. I advise that he consult again with his treating
> psychiatrist, follow the doctor's recommendations for treatment, and then
> be released to return to work effective within the next two weeks.
> C. Finally, Mr. Ramey has had a long history of addiction. His
> recent violation of the company's drug and alcohol policy indicates that
> Mr. Ramey does require alcohol rehabilitation treatment as a condition of
> his return to work. I recommend he resume appropriate treatment.

By memorandum dated July 16, 2004, Sigafoose directed the grievant to report to

a Continued Employment Meeting on July 22, 2004. The memorandum states:

> On September 30, 2003, you were issued a Decision Making Leave
> (DML) for violating the Company's Drug and Alcohol Policy. At that
> time you were informed that you must enter into and successfully
> complete an approved rehabilitation program. You were also informed
> that failure to do so would result in your termination from the Company.
> This requirement was further documented in my memorandum to you of
> September 30.
> On November 10, 2003, the Company was notified that you had
> been discharged from the approved rehabilitation program that you had
> entered. You were terminated from the program for having a positive
> Breathalizer reading while in attendance. This was a program violation.
> As a result of the above incident, you have not fulfilled your
> obligation to successfully complete an approved rehabilitation program as
> required by your DML agreement, consequently, it appears discharge is
> warranted.

At the Continued Employment Meeting on July 22, 2004, John Coleman, the

Union President, produced the document dated October 16, 2003, which reflects the

grievant's negative test results for drugs. Duarte pointed out that the test was not for

alcohol. Coleman replied that it was the only test administered to the grievant while he was in the Kolmac program. The meeting was adjourned pending further investigation regarding the grievant's testing and documented results while in the program.

Duarte called Value Options and learned that people in rehab programs are tested frequently by breathalizer for alcohol, but the test results are not disclosed to employers or outsiders, because participants occasionally "fall off the wagon" and records are not kept. Value Options sent Duarte a copy of the grievant's Kolmac Clinic Discharge Summary, dated November 6, 2003, which states:

> **Significant Findings:** The patient had a 12 year history of pathological use of alcohol. Manifestations of this included:
> *Reduced internal control over use
> *Abnormally high tolerance
> *Continued use despite adverse consequences (continued drinking despite job suspension)
> **Course of Treatment:**
>     **Detoxification and Medication:** Detoxification was not required. Antabuse was administered on a daily basis. No other medications were prescribed.
>     **Rehabilitation Phase:** Attempts to stabilize the patient were unsuccessful because of repeated relapses.
>     **Continuing Care Phase:** The patient did not enter this phase of the treatment program.
> **Discharge Description:** Did Not Complete Rehabilitation: Staff Initiated. The patient continued to deny an alcohol problem, did not feel that he needed treatment, and continued drinking alcohol.

By memorandum of November 8, 2004, Sigafoose informed the grievant that his employment was terminated. The memorandum states in part:

> Subsequent to the [Continued Employment] meeting the Company contacted Kolmac Clinic regarding your performance in the rehabilitation program. The clinic stated that you did not complete the Rehabilitation Phase due to repeated relapses. Consequently, you did not enter the Continuing Care Phase of the program. Further, they indicated that you continued to deny an alcohol problem, that you did not feel you needed treatment, and that you continued to drink alcohol. Consequently, it was

determined that you could not be successfully treated under the program at that time and your participation was terminated.

As you are aware, one of the conditions of the DML that was issued to you on September 30, 2003, is that you must enter into and successfully complete an approved rehabilitation program for drugs and alcohol. Additionally, failure to do so would result in your termination from the Company. As indicated above, you did not complete the program at Kolmac Clinic. Consequently, you have failed to meet your obligation to the Company as agreed to as a part of the DML.

On January 6, 2005, a Step Two meeting was held to discuss the instant grievance. Coleman produced a letter, dated July 27, 2004, from Kolmac Clinic to an investigator in the D.C. Defender Services Office, stating that the grievant "was given a random urinalysis on October 13, 2003. The results were negative." During the meeting, Coleman emphasized that the letter does not indicate the grievant's failure to pass a breathalizer test, as asserted in several other documents.

## Issue

Whether the grievant was discharged for just cause; and if not, what is the appropriate remedy?

## Company Position

The Company asserts that the grievant's testimony was incredible with regard to drinking one beer prior to reporting to work on August 30, especially because he tested positive at a BAC of 0.065 and admitted to heavier drinking in interviews with Kolmac, Dr. Schulman and Duarte. It further maintains that the grievant refused to enroll in the Kolmac Clinic, and he never contacted Wade. In this regard, it points out, the choice of a rehab program was Wade's, not the grievant's. The Company submits that the Union's

reliance on the grievant's October 13 urinalysis test results for entry into the Kolmac program means little, given that he did not successfully complete the program. Further, it contends, the grievant's testimony that he never admitted to being an alcoholic and did not drink while in the program is contrary to the Kolmac records, Wade's understanding and Dr. Schulman's report. The Company emphasizes that the grievant understood the DML terms concerning successful completion of the program to avoid termination of employment. Moreover, it notes, his job duties required a CDL in the operation of commercial motor vehicles. It points out that although initially there was confusion concerning the reasons for the grievant's discharge from the program, the Discharge Summary, which management later received, establishes the reason as his noncompliance with the program's requirements. The Company points to the grievant's contradictory testimony that he had determined to leave the program anyway when Kolmac coincidently had issued the termination action, yet he would have completed the program. It says that management gave the grievant numerous chances to enter and successfully complete a program. The Company observes that, notwithstanding the DML's clear admonition that further infractions within the next 18 months would result in termination, he violated the requirement to attend and successfully complete the Kolmac treatment program.

### Union Position

The Union contends that the grievant was attempting to complete his rehabilitation prior to his termination on October 27. It labels as coincidental his hospital visit on October 28, after which, it notes, he remained on sick pay under a doctor's care

through April 2004. Moreover, it says, Dr. Schulman released him to return to work. The Union emphasizes that Wade's letter to Saucier and the notice of Continued Employment Meeting dated July 16, 2004, are totally wrong in citing a positive breathalizer test as the reason for the grievant's discharge from the Kolmac program. The Union observes that management waited nine months after the grievant's discharge from the program to issue the Continued Employment Meeting letter, and then management waited another four months after that meeting to issue the termination letter -- totaling more than one year from the grievant's discharge from the program. During that period, it submits, Duarte learned of the information in Kolmac's letter to the D.C. Defender Services Office, stating that the grievant had no positive tests while in the program. The Union maintains that the Session Notes are contrary to the reasons for discharge that are given in the Discharge Summary and the Company's termination memorandum, because the notes reflect only one relapse, midway through his participation, and contain several positive comments concerning his progress. Additionally, it observes, a Kolmac counselor initially determined that his history was not so serious as to require detoxification. It rhetorically questions how the grievant could have relapsed in light of his testimony that he had stopped drinking prior to entering the program and absent a positive alcohol or drug test. For these reasons, the Union argues, the grievant was erroneously terminated from the program and never given an opportunity to complete rehabilitation. It concludes that had management fully investigated the matter and found these inconsistencies, the termination memorandum would not have been issued.

## Discussion and Findings

I find the grievant's testimony to have been inconsistent and generally incredible in the face of strong contradictory evidence. The grievant testified to having had "maybe a beer" at about 6:00 p.m. before reporting to work at 11:00 p.m., yet he tested positive with a BAC level of 0.065 on the morning of August 30, 2003, and Wade testified that he reported drinking after 7:00 p.m., and Dr. Schulman's report states: "Mr. Ramey acknowledged that he had been drinking prior to coming to work, in violation of company policy." The grievant testified that he waited several weeks for Wade to receive documents from the Company after the meeting on September 15, 2003, yet Wade testified that he expected the grievant to contact Kolmac after the meeting. The grievant testified that he drank one beer one time while in the Kolmac program before the October 20 session, yet the Session Notes for October 20 and 27 respectively state, obviously based on his self-reporting, that he "relapsed over weekend" and "drank on feelings of reacting to others." The grievant testified that he denied being a "recovering alcoholic" and said he was an "assumed alcoholic" in the Kolmac sessions, yet the Session Notes for October 21 – 23 reflect otherwise. The grievant's testimony that he refused management's offers to return to work after discharge from Kolmac because he didn't need the treatment program is supported by Dr. Schulman's report,[3] yet he testified that on October 27 his intent was to complete the rehab program.

---

[3] Dr. Schulman's report states, under a section titled "History of his Subsequent Alcohol Rehabilitation Treatment":

On October 20, 2003, Mr. Ramey began treatment at the Kolmac Clinic. Meanwhile, he was continuing to work during the day. He attended the program from 5:30 p.m. to 8:30 p.m. Although he felt that he did not have a problem with alcohol, he initially agreed to attend the program.

It was Mr. Ramey's contention, however, that he had to "get out of the program." On October 24, 2003, he advised program personnel that he had had a beer,

14

I further find that the assertions of the grievant and the Union mischaracterize the information contained in Kolmac's letter of July 27, 2004, to the D.C. Defender Services investigator. The letter states that "Mr. Ramey was given a random urinalysis on October 13, 2003." It does not address the frequency of breathalizer tests or other tests for alcohol. Accordingly, there is no basis for the assertion made in the Continued Employment Meeting held on July 22, 2004, five days before the date on the Kolmac letter, that the grievant had tested negative on all tests administered to him at Kolmac. In this regard, based on the inconsistencies and contradictions with other evidence in the grievant's testimony concerning other factual questions, I have not credited his testimony that he took one breathalizer test early in the program. Indeed, the grievant's inconsistent testimony reaches to this question, given his acknowledgement that in the Step Two meeting he "might have said" he'd taken a breathalizer test at every session. Finally, I find no evidentiary basis for the Union's assertion that Duarte knew the contents of the July 27 letter prior to the termination memorandum of November 8, 2004. In this regard, I find credible Duarte's hearsay testimony, based on a Value Options representative's statements to him during his inquiry following the Continued Employment Meeting on July 22, 2004, that in the interest of patient rehabilitation, the test results for group session participants are not disclosed or retained.

I also find of little moment the facts that Wade's letter and the notice of the Continued Employment Meeting wrongly cite a positive breathalizer test as the reason for

---

although when he began the program, he had been placed on Antabuse, a drug that interferes with the metabolism of alcohol, producing a rather adverse physiological response to drinking.

When Mr. Ramey returned to the program, on October 27, 2003, he was discharged because of noncompliance. It was his contention that drug addicts were allowed to continue in the program after they had experienced relapses. He felt that his dismissal was discriminatory.

the grievant's discharge from the treatment program. The Company's termination action ultimately was based upon the reasons contained in the Summary Discharge, dated November 6, 2003, and received by Duarte after July 22, 2004. The Union has not argued that it did not have a fair opportunity to defend the grievant against the actual grounds for the termination of his employment.

I find unconvincing the Union's assertion that the Session Notes are contrary to the reasons for discharge in the Discharge Summary and the Company's termination memorandum. Even the grievant has admitted his continuing denial, during the sessions, of an alcohol problem. Absent any expert testimony to support the Union's assertion, I shall not review determinations ultimately made, as Wade testified, by Kolmac medical staff in consultation with the counseling staff regarding an individual's continued participation in treatment sessions. My rendering of arbitral findings on medical questions based upon the brief Session Notes written by different counselors would not be appropriate.

In the same vein, I find unpersuasive the Union's contention that if management had conducted a thorough investigation, it would have uncovered the inconsistencies resulting in the grievant's erroneous discharge from the program. The original incorrect reason for the action stemmed from administrative error in the part of Value Options or Kolmac. As Duarte testified, the Company relies upon those organizations for the management of its employee assistance program and related operations.

The final question is whether the delays in issuing disciplinary action after Wade's notification to management of the grievant's discharge from the program violate notions of fairness or industrial due process. The Continued Employment Meeting

memorandum was issued nine months after the Kolmac discharge and four months after Dr. Schulman's report. The termination memorandum was issued almost four months after the Continued Employment Meeting.

The lengthy delay can be attributed to both management and the grievant. After discharge from the program, the grievant was on sick pay until the end of April 2004. During this period and before the DML arbitration award issued in mid-Decmeber 2003, management, the Union and the grievant were discussing settlement of the dispute. Also, the grievant, represented by private counsel, and management unsuccessfully attempted to resolve the dispute in mediation. Duarte testified without contradiction that he had called the Union over a period of time regarding two different Company offers of resinstatement which, the Union said, the grievant was still discussing. It appears that the parties' impasse concerned the implementation of Dr. Schulman's finding that the grievant "does require alcohol rehabilitation treatment as a condition of his return to work" and the recommendation that "he resume appropriate treatment."

Even assuming that the settlement discussions continued through April 30, 2004, while the grievant was out on sick pay, management took no action until July 16, 2004, when the Continued Employment Meeting memorandum was issued. Shortly after the meeting was adjourned on July 22, 2004, Duarte received a copy of the Discharge Summary, presumably before the end of July 2004. The record contains no specific explanation for management's delay of more than three months in issuing the termination memorandum.

Absent a specific showing, or even an argument, that the delays in implementing the discipline prejudiced the grievant in his defense, I find no basis for overturning the

termination on procedural grounds. The grievant understood the DML's terms and conditions regarding entry into and successful completion of a treatment program. Restoration of his CDL following completion of the program was required for the performance of his job duties. He failed to meet these requirements after discharge from the Kolmac treatment program. Accordingly, the termination of his employment must stand.

**AWARD**

The grievance is denied.

Jerome H. Ross, Arbitrator

July 18, 2005
McLean, Virginia